PAUL A. BONIN, Judge.
|,Anthony Farrier was found guilty by a jury of the sexual battery of Admirabilis,[1] an unrelated, six-year old girl who resided with him in the same home. Mr. Farrier was then sentenced to a term of imprisonment of seventy-five years at hard labor, *1237 which falls within the statutorily-authorized sentencing range. See La. R.S. 14:43.1 C(2).[2] Mr. Farrier appeals his conviction but not his sentence.
Mr. Farrier first assigns as error the trial judge’s refusal to permit him to elicit opinion testimony from Dr. Bradley McAu-liff, a professor and research psychologist, regarding young children’s memory and suggestibility. After hearing from Dr. McAuliff outside of the presence of the jury, the trial judge decided that his opinion testimony would only serve to confuse the jury. Finding no error of law in her ruling, we conclude that the trial judge did not abuse her discretion in excluding his proposed expert testimony.
|2Mr. Farrier next assigns as error the trial judge’s admission into evidence of recordings of three telephone conversations to which Mr. Farrier was a party, each of which was initiated by him while being detained awaiting trial. After considering each of Mr. Farrier’s objections at trial individually, we find that the trial judge did not abuse her considerable discretion by admitting that evidence at the close of the prosecution’s ease-in-chief.
Accordingly, we affirm Mr. Farrier’s conviction and sentence.[3] We explain our decision in greater detail below.
I
In this Part we set forth the facts pertinent to our review of Mr. Farrier’s assignments of error.
A
Admirabilis was six-years old at'the time of this offense. Shortly after Admirabilis’ birth, her mother, Ms. Jones, placed her in the care of Rashelle Farrier, whom Admir-abilis refers to as “Nanny.” Ms. Jones testified that this arrangement was necessary due to her struggles with drug addiction and that Ms. Farrier’s home provided Admirabilis with a stable place to live. Admirabilis lived with Ms. Farrier until Ms. Farrier’s relationship with Ms. Jones’? ex-boyfriend ended. At that point, Admir-abilis was placed in the care of Shirley Hunter, who lived next door to Ms. Farrier in the other half of a shotgun double. The others |sliving in Ms. Hunter’s home, off- and-on, besides Admirabilis, included Ms. Hunter’s boyfriend, Charles Mitchell, her two teenaged sons, and Mr. Farrier. Mr. Farrier is the adult brother of Nanny and lived in Ms. Hunter’s living room on the couch. Admirabilis remained in Ms. Hunter’s home despite Ms. Jones’ graduation from a drug program because of Ms. Jones’ decision to remain in Baton Rouge; Ms. Jones instead chose to visit with Ad-mirabilis and her other children “once or twice per month.”
On the occasion of her brother’s funeral, Ms. Jones came to New Orleans and decided to visit with Admirabilis, picking her up for an overnight stay with her aunt. While bathing Admirabilis that evening, Ms. Jones noticed that Admirabilis was hypersensitive and reacted in pain when touched in her genital area;' and, upon closer examination, the mother observed *1238 redness and swelling. Admirabilis then told Ms.-Jones that Mr. Farrier touched her in that area, watched “nasty movies” with her, and had her imitate what happened during the films.
Ms. Jones immediately brought Admira-bilis to the emergency room at Children’s Hospital. Admirabilis was examined by Anne Troy, a nurse practitioner. Genital and rectal swabs were taken pursuant to a sexual assault kit, which did not detect any sperm in those areas. The New Orleans Police Department was also contacted, and the police investigation began.
B
Detective Jounay Thomas-Ross, a member of the Child Abuse Unit, was dispatched to Children’s Hospital in response to this allegation of sexual abuse. |4Ms. Jones, in her statement to Detective Thomas-Ross, provided Mr. Farrier’s name along with the address where the incident occurred.
Admirabilis then left Children’s Hospital and was taken home by her father, Richard Collins, for the evening. Detective Thomas-Ross located Mr. Farrier’s picture in the MOTIONS program. Detective Thomas-Ross’ supervisor, Sergeant Arnold Williams, then went to the home and conducted a single-photo “show-up” identification from which Admirabilis positively identified Mr. Farrier as her abuser. Admirabilis signed and dated the back of the picture. A six-photo “show-up” identification procedure was not deemed necessary because Admirabilis lived with Mr. Farrier and thus could easily identify him.
The next day Admirabilis went to the Child Advocacy Center to be interviewed by Nurse Practitioner Troy. The interview was monitored by Detective Thomas-Ross and recorded on video. These interviews consist of a medical examination of the victim, then a forensic interview where questions are asked of the child to explain what occurred during the potentially-criminal incident.
The forensic interview of Admirabilis was conducted in the “balloon room” at the Child Advocacy Center. During that interview, Admirabilis, following some reluctance to disclose and visibly nervous, provided a clear and detailed history of the sexual abuse. She indicated that Mr. Farrier had engaged in oral, anal, and vaginal sex with her and had used spit and lotion as lubrication for such acts. Admirabilis identified where she was abused using a diagram of the human body and stated that the abuse occurred in Ms. Hunter’s home on a daily basis whenever Admirabil-is and Mr. Farrier were alone in the house. Admirabilis also stated that Mr. Farrier would show her “nasty videos” on his computer, and then Mr. Farrier would tell Admirabilis to imitate what they were doing in that video in various Instates of undress. Detective Thomas-Ross watched the interview in an adjoining room and was able to communicate with Nurse Practitioner Troy throughout the interview via an earpiece.
Following a successful identification, Detective Thomas-Ross applied for and obtained an arrest warrant for Mr. Farrier and a search warrant for the residence. Detective Thomas-Ross then went to the Admirabilis’ home on Piety Street in New Orleans; Mr. Farrier answered the door and was immediately placed under arrest. The police then entered the home and seized a laptop computer belonging to Mr. Farrier.
Following his arrest, Mr. Farrier was held in custody awaiting trial. During this time, he placed numerous calls on the telephone. These calls were recorded by the jail, and the jury listened to three of the recordings. The contents of these calls are discussed in-depth in Part III, infra.
*1239 c
On November 3, 2011, a grand jury indicted Mr. Farrier, charging him with the aggravated rape of Admirabilis between May 28, 2010 and July 9, 2011, a violation of La. R.S. 14:42. Mr. Farrier pled not guilty at his arraignment. On January 6, 2014, the bill of indictment was amended to charge Mr. Farrier with sexual battery, a violation of La. R.S. 14:43.1, and the aggravated rape count was dismissed. Prior to trial, Mr. Farrier moved to exclude the voice recordings of the jailhouse calls under La. C.E. art. 412.2, which motion the trial judge subsequently denied.
Mr. Farrier was tried by jury. During the trial, the trial judge refused to permit Mr. Farrier to elicit opinion testimony from Dr. McAuliff, Mr. Farrier’s sole witness. Mr. Farrier proffered Dr. McAu-liffs qualifications and proposed 1 (¡testimony. The trial judge also permitted, over Mr. Farrier’s objection, the district attorney to introduce into evidence the redacted voice recordings of three of the jailhouse phone calls to which Mr. Farrier was a party.
At the conclusion of trial, the jury found Mr. Farrier guilty of violating La. R.S. 14:43.1 C(2). Mr. Farrier was sentenced to a term of imprisonment of seventy-five years at hard labor in the custody of the Department of Corrections, twenty-five of which must be served without the benefit of parole, probation, or suspension of sentence. Mr. Farrier was also ordered to register as a sex offender upon his release.
II
Mr. Farrier complains on appeal that the trial judge refused to permit him to elicit opinion testimony from Dr. McAu-liff regarding young children’s memory and suggestibility. At the outset, we note that Mr. Farrier has preserved this issue for our review because he timely objected to the exclusion of Dr. McAuliffs opinion testimony and proffered that testimony for our review. See La. C.E. art. 103 A(2) (error may not be predicated on a ruling excluding evidence unless “the substance of the evidence was made known to the court by counsel”); State v. Magee, 11-0574, pp. 56-64 (La.9/28/12), 103 So.3d 285, 323-28; State v. Green, 10-0791, p. 23 (La.App. 4 Cir. 9/28/11), 84 So.3d 573, 587-88.
When dealing with the proposed testimony of an expert, “the critical question [for the trial judge qua gatekeeper] is ‘On this subject, can a jury receive appreciable help from this person?’ ” State v. Foret, 628 So.2d 1116, 1129 (La.1993) (quoting Elizabeth Baker, Comment, Psychological Expert Testimony on a Child’s Veracity In Child Sexual Abuse Prosecutions, 50 La. L.R. 1039, 1047 (1990)) (emphasis added). See also La. C.E. art. 702 (“If scientific, technical, or |7other specialized knowledge mil assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”)[4] (emphasis added).
By explicitly finding that the opinion testimony of Dr. McAuliff would only serve to confuse the jury, the trial judge answered the critical question that this testimony would not be helpful and excluded the testimony. See La. C.E. art. 403 (“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or mis *1240 leading the jury, or considerations of undue delay, or waste of time.”). We review that determination under an abuse-of-discretion standard. See State v. Marlowe, 10-1116, p. 56 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 977. Under that standard of review, unless we find that the trial judge’s ruling is based upon an erroneous application of the law or a clearly erroneous assessment of the evidence, we will defer to the trial judge’s determination. See State v. Hampton, 13-0580, p. 2 (La.App. 4 Cir. 2/19/14), 136 So.3d 240, 242-43.
We. emphasize that the trial judge’s decision to exclude Dr. McAuliffs opinion testimony does not imply any shortcoming in Dr. McAuliffs knowledge, experience, training, or education.[5] Dr. McAuliffs professional accomplishments |8and his in-depth studies in the field of children’s memory and suggestibility are considerable and impressive.[6]
We must determine whether the trial judge abused her considerable discretion in excluding this proposed opinion testimony as not being helpful to the jury. __ Like the trial judge here, some research psychologists themselves question whether opinion testimony, such as that which Mr. Farrier proposed to offer from Dr. McAu-liff, is helpful at all to jurors. See Jodi A. Quas, William C. Thompson, and K. Allison Clarke-Stewart, Do Jurors ‘Know’ What Isn’t So About Child Witnesses?, 29.4 Law and Human Behavior, 425-56 (August 2005).
The authors identify the substance of Dr. McAuliffs proposed opinion testimony as “[ejxpert testimony about children’s ability to recount prior experiences and about factors that affect children’s memory,” which is an example of “social framework evidence.” Id. at 426. This type of evidence “is offered to provide the fcrier-of-fact (usually a jury) with knowledge derived from scientific research that gives an appropriate context for understanding specific evidence in a given case.” Id. Notably, “[sjocial framework testimony is distinguished from [other] expert testimony [which is] based on direct examination of the child, for example by a therapist or clinician.” Id. And, as is the case here, the proposed expert “need not have examined the child to provide social framework evidence.” Id. “Instead, the expert may simply report findings and conclusions from scientific 19literature that are relevant to the jury’s evaluation of the child’s statements, without expressing an opinion about the child’s credibility.” Id.[7]
Remarkably, however, Mr. Farrier did not seek to have this type of “social framework evidence” subjected to a particularized Daubert hearing in order to test its scientific reliability. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-97, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *1241 State v. Chauvin, 02-1188, p. 18 (La.5/20/03), 846 So.2d 697, 709; Hampton, 13-0580, p. 3, 136 So.3d at 243.
The authors noted that during the 1990s “a new wave of studies emerged that focused on children’s reactions to suggestive interview techniques.” Quas et al., supra at 427. The authors described these studies as “clearly demonstrating] that children’s accounts of events can be radically altered through the use of highly suggestive interrogation practices.” Id. The issue addressed by the authors “concerned whether testimony about the studies is helpful to jurors” and summarized competing views of researchers on that subject. See id. at 427-28. Researchers on one side of the argument “argue[] that the evidence gleaned from the studies is unnecessary” because jurors “already believe that young children are prone to false reports, and thus expert testimony unfairly stokes the skepticism of jurors who already distrust children’s claims.” Id. at 427 (emphasis added). Researchers on the other side of the argument argue that such psychological research furnishes jurors with insights which are far beyond their ken. See id. at 427-28.
The authors concluded that their “study represents an important step in evaluating the need for expert witnesses in child sexual abuse cases and in cases 110where suggestibility concerns are raised.” Id. at 452. But, importantly, they advised caution for those who would attempt to generalize their findings to specific legal cases. See id.
Dr. McAuliff himself acknowledges that “the admissibility of social framework evidence remains controversial.” Bradley D. McAuliff and Margaret Bull Kovera, Estimating the Effects of Misleading Information on Witness Accuracy: Can Experts Tell Jurors Something They Don’t Already Know?, 21 App. Cognit. Psychol. 849-70 (2007).[8] Dr. McAuliff and his coauthor pose the following question: “Can expert testimony on witness suggestibility tell jurors something they don’t already know?” Id. at 864. They reply, “Our findings provide preliminary evidence that the answer to this question is ‘yes.’ ” Id. (emphasis added). And, notably, they too acknowledge limitations “when considering whether [their] findings generalize to actual cases involving expert testimony on witness suggestibility.” Id. (emphasis added).
During his testimony before the trial judge, Dr. McAuliff explained the necessary and plainly obvious limitations on his research in this field. Ethical considerations on research with human subjects constrains and even forbids replicating instances of child sexual abuse in order to collect data to support a hypothesis about the effects of suggestibility on childhood memory. Thus, the research upon which Dr. McAuliff relies is necessarily relegated to simulations or surrogate situations. For example, testing a child’s memory about a touching episode may be approached through the use of a make-believe physician or actor who examines the child and then interviews about that examination follow with the | nchild. But in no event are child sexual abuse incidents staged or set in mock scenarios.[9]
In light of these considerations, and in the absence of a Daubert hearing, we find that the trial judge did not abuse her considerable discretion when, under La. C.E. art. 403, she excluded Dr. McAuliffs *1242 opinion testimony as not being helpful to the jury.
II
We now turn to address Mr. Farrier’s assignment that the trial judge erred in admitting into evidence the voice recordings of three telephone conversations to which Mr. Farrier was a party and made while in custody awaiting trial. We review each of the three rulings under an abuse-of-discretion standard. See State v. Gordon, 13-0495, p. 23 (La.App. 4 Cir. 7/16/14), 146 So.3d 758, 772 (discussing standards of review for evidentiary rulings on other crimes evidence, on relevance, and whether the probative value of evidence is outweighed by its prejudice); State v. Hamdalla, 12-1413, p. 10 (La.App. 4 Cir. 10/2/13), 126 So.3d 619, 624 (citing State v. Mosby, 595 So.2d 1135, 1139-40 (La.1992)) (“Generally, a trial court’s rulings on evidentiary issues will not be disturbed absent a clear abuse of discretion.”); Magee, 11-0574, p. 52, 103 So.3d at 321 (“The district court is accorded great discretion in determining whether evidence is relevant and, absent a clear abuse of discretion, rulings on relevancy will not be disturbed on appeal.”).
In reviewing' each of the three rulings, however, we limit our consideration to only those objections made by Mr. Farrier at trial at the time that the prosecution sought admission of the recordings. See La. C.E. art. 103 A(l) (error may not be j ^predicated upon a ruling which admits evidence unless a substantial right of the party is affected and a timely objection is made “stating the specific ground of objection”); La.C.Cr.P. art. 841 C (“The necessity for and specificity of evidentiary objections are governed by the Louisiana Code of Evidence.”). We note that the prosecution did not seek to introduce the recordings into evidence until the close of its . case-in-chief. The significance of this timing is that the jury had already heard the testimonies of the police officers, Nurse Practitioner Troy, Ms. Jones, and Admira-bilis herself, as well as viewed the videotaped forensic interview from the Child Advocacy Center before Mr. Farrier’s recorded telephone conversations were played for the jury.
At the outset, we note that Mr. Farrier initiated and actively participated in each of the conversations while he was detained awaiting trial. Each conversation was preceded by a recorded warning that the conversation was subject to monitoring by prison officials. Thus Mr. Farrier’s recorded conversations were clearly consensual on his part, and his statements, if relevant, were admissible. We do note, however, that none of the other parties to these conversations testified at trial.
In each section below we describe the content of one of the three recorded conversations, the specific contemporaneous objection made by Mr. Farrier to that recording in the trial court, and address whether the trial committed reversible error in her ruling which admitted that voice recording. We consider each conversation in chronological order.[10]
_bA
The first of the three calls was made by Mr. Farrier to his sister, Ra-shelle, on July 11, 2011, the same day that he was arrested. Mr. Farrier tells Ra-shelle that he plans to accept the criminal charges (which charges he does not specify) because Admirabilis and three other named persons (who did not testify at the trial) had already told the police that they *1243 had “caught” him watching child pornography on his computer. Mr. Farrier states that he “can’t win like this” at trial and that his watching of child pornography permits the prosecution to lump all of his charges together and convict him. His sister expresses astonishment at this turn of events. Then Mr. Farrier says that he hopes that some kind of leeway will be given to him for being a first offender.
Mr. Farrier’s contemporaneous objection argued that the content of the call was irrelevant under La. C.E. art. 401 or, if relevant, so unduly prejudicial as compared to the evidence’s probative value as to justify the evidence’s exclusion under La. C.E. art. 403. The trial court overruled this objection and permitted this call to be introduced into evidence. We find no abuse of discretion in this determination. See State v. Wright, 11-0141, pp. 10-11 (La.12/6/11), 79 So.3d 309, 316 (noting specifically that rulings on the admission of other crimes evidence and evidence under La. C.E. art. 412.2 are reviewed for abuse of discretion).
“ ‘Relevant’ evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” La. C.E. art. 401. Here, the question that arises is whether Mr. Farrier’s references to him |14watching child pornography in this recorded call are relevant to the prosecution of Mr. Farrier for the sexual battery of Admirabilis.
Generally, “evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.” La. C.E. art. 404 B(l). The Legislature, however, has provided an exception to this general rule: “When an accused is charged ... with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s ... acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.” La. C.E. art. 412.2 A.[11]
Unquestionably, Mr. Farrier has been charged with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense. As charged here, the specific offense for which Mr. Farrier was on trial required the prosecution to prove beyond a reasonable doubt that Mr. Farrier intentionally touched the anus or genitals of Admirabilis without her consent. See La. R.S. 14:43.1 A(l). And, of course, Mr. Farrier is an adult male, and Admirabilis was six years old at that time.
Here, the recording speaks directly to Mr. Farrier’s lustful disposition towards children. Notably, in this conversation, Mr. Farrier does not tell his listener that the allegations of him watching child pornography are false; he is loudly silent about the truth of the allegations and instead says that he cannot fight |1B“this” and hopes for leniency as “a first offender.” Mr. Farrier’s statements are also relevant to his prosecution to confirm Ad-mirabilis’ videotaped forensic interview and testimony at trial that Mr. Farrier would show her child pornography and then have Admirabilis imitate what was done on the video.
We are not persuaded by the defendant that the evidence is unduly preju *1244 dicial in nature as to hold that the trial judge abused her discretion in finding that the evidence did not warrant exclusion under La. C.E. art. 408, which provides: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” In striking the balance between probative value and prejudicial effect, the Supreme Court, in State v. Rose, has stated: “Any inculpa-tory evidence is ‘prejudicial’ to a defendant, especially when it is ‘probative’ to a high degree. As used in the balancing test, ‘prejudicial’ limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.” 06-0402, p. 13 (La.2/22/07), 949 So.2d 1286, 1244 (internal citations omitted). “The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.” Id.
Here, this relevant evidence is obviously prejudicial towards Mr. Farrier as to the merits of his case. Mr. Farrier at trial however does not explain why this evidence is unduly prejudicial. Thus, the trial judge did not abuse her discretion in admitting this recorded conversation.
JLlsb
The next recorded telephone call was made by Mr. Farrier to an unidentified man on August 9, 2011, almost one month after Mr. Farrier’s arrest. In the call Mr. Farrier accuses Admirabilis, Ms. Hunter, and Admirabilis’ “grandpa” of “getting back at him” although he does not explain any of those parties’ respective motives. The unidentified man describes himself as “speechless” over the recent developments and reminds Mr. Farrier that he had previously advised him to leave Ms. Hunter’s house. Mr. Farrier responds that he told Ms. Hunter that he was willing to move out at any time at her request. The man replies that Mr. Farrier should have left when the other residents of the house started making comments about his sexual inclinations towards young girls. Mr. Farrier, without any reasoning, states that he will not be allowed any witnesses to testify on his behalf at trial.
Mr. Farrier then wonders aloud what he will do after being released from jail. The man responds that no one will ever want to associate with Mr. Farrier again, even if he is found not guilty, explaining that the rest of Mr. Farrier’s life will be scarred by this charge. The man then reports that “everybody” is talking about how Mr. Farrier looks at “young girls.” • He next comments to Mr. Farrier that “everybody knows you like to look at young girls walking down the street.” He explains that people are saying that Mr. Farrier has something wrong with him and that, considering his lifestyle, it is hard not to believe. The man also remarks about a “few comments” that Mr. Farrier has made about particular young girls.
Notably, as in the earlier conversation, Mr. Farrier did not challenge or object to the substance of any of the statements made by the man. Mr. Farrier responds that he always stayed by himself to keep something like this from 117happening and that he would only play games and stay on the computer. Mr. Farrier then expresses frustration that, despite his efforts, he still got in trouble. Mr. Farrier finally explains that the police seized his computer as protocol for these types of arrests.
Mr. Farrier’s contemporaneous objection was threefold. First, Mr. Farrier argued that a statement by the unidentified man in the recording, specifically “Everybody was always talking about you looking at young girls,” constituted “hearsay with *1245 in hearsay.” Second, Mr. Farrier contends that he did not receive reasonable notice that the district attorney intended to introduce evidence under La. C.E. art. 412.2. Third, Mr. Farrier claimed that, even if notice was provided under Article 412.2, the recording was unduly prejudicial under Article 403. The trial court overruled this objection, and we find no abuse of discretion in that determination. See Wright, 11-0141, pp. 10-11, 79 So.3d at 316. We address each objection individually.
1
Mr. Farrier’s first contemporaneous objection to the second recorded call claimed that a particular statement made by the unidentified man constituted “hearsay within hearsay.” In that statement, the unidentified man states, “Everybody was always talking about [Mr. Farrier] looking at young girls.” This statement, in context, is primarily in reference to how Mr. Farrier’s life will never be the same even if he were found not guilty of this particular charge. The man further states that people speak of Mr. Farrier this way because of his lifestyle and the strange comments that he makes about young girls. Mr. Farrier does not challenge or object to any of the substance of the statement made by the | ^unidentified man during that call; Mr. Farrier simply states that he tried to stay by himself and on the computer and that, despite those efforts, he still got in trouble.
“ ‘Hearsay5 is a statement, other than the one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” La. C.E. art. 801 C. Hearsay evidence is generally excluded “because the value of the statement rests on the credibility of the out-of-court as-serter who is not subject to cross-examination and other safeguards of reliability.” State v. Legendre, 05-1469, p. 7 (La.App. 4 Cir. 9/27/06), 942 So.2d 45, 50. See also State v. Spell, 399 So.2d 551, 555 (La.1981).[12]
Hearsay testimony is not admissible at trial unless provided for by law. See La. C.E. art. 802. The Code of Evidence has listed several types of statements that are classified as “not hearsay.”[13] One such statement is an “adoptive admission,” which is statutorily-defined as a “statement ... offered against a party and ... of which [that party] has manifested his adoption or belief in its truth.” La. C.E. art 801 D(2)(b). A “party’s admissions ... are not excluded by virtue of the hearsay rule, for they are defined as non-hearsay.” La. C.E. art. 801 cmt. These “statements are better classified as non-hearsay because the rationale for their admissibility is not the trustworthiness or necessity underlying the hearsay exceptions, but rather the simple practical corollary of the adversary system that a party should not be permitted to object that he had no opportunity to cross-examine himself or that he is unworthy of credence save when speaking under sanction of an oath.” La. C.E. art. 801 cmt. (quotations omitted).
119A party may manifest an adoption or belief in the truth of a statement through silence and acquiescence. This type of admission is often referred to *1246 as a “tacit admission.” See State v. Grant, 47,365, p. 11 (La.App. 2 Cir. 9/20/12), 105 So.3d 81, 88 (noting that jurisprudential rule follows common law tradition). If another person makes a statement incriminating a defendant in the defendant’s presence and hearing, “under circumstances where a denial, explanation, or reply would be expected” and where the defendant is not in legal custody and is at full liberty to speak, “evidence of that statement, and of the defendant’s silence and failure to deny or explain it, may be submitted to the jury for consideration as an admission by the defendant of that statement.” State v. McClain, 254 La. 56, 59, 222 So.2d 855, 857 (1969). See also State v. Carey, 628 So.2d 27, 32 (La.App. 2d Cir.1993) (on reh’g). “Neither the witness to a verbalized admission nor the witness to an admission through silence is obliged to vouch for the truth of the content of the admission. [The witness’] testimony is admitted not as the truth ..., but only to show the defendant’s acquiescence in that statement through failure to deny or explain.” McClain, 254 La. at 60, 222 So.2d at 857. See also Carey, 628 So.2d at 32.
Here, Mr. Farrier’s lack of objection to the content of the statement by the unidentified man during that call constitutes a tacit adoptive admission under La. C.E. 401 D(2)(b). As such, the statement made by the man is “not hearsay.” Thus, we find no error in the trial judge’s decision to overrule Mr. Farrier’s objection requesting that the second call be excluded as “hearsay within hearsay.”
120^
Mr. Farrier next asserts that he did not receive “reasonable notice” of the prosecution’s intent to introduce evidence at trial under Article 412.2. Article 412.2 B provides: “In a case in which the state intends to offer evidence under the provisions of [Article 412.2], the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.” Legislative committee minutes indicate that the “reasonable notice” requirement was inserted into this article because “the senators were concerned with the defendant’s right not to be ambushed with evidence of prior sexually deviant behavior....” Williams, 02-1030, p. 5, 830 So.2d at 987. This reasonable notice requirement, however, does not require that the trial court conduct a hearing on the admissibility of that evidence prior to trial. See id., 02-1030, pp. 4-6, 830 So.2d at 986-87.
Here, reasonable notice was given to Mr. Farrier under Article 412.2. It is undisputed that Mr. Farrier received tapes of 26 recorded telephone conversations well over one year before trial and that the three redacted recordings introduced at trial came from that disclosed evidence. See, e.g., State v. Scoggins, 10-0869, p. 11 (La.App. 4 Cir. 6/17/11), 70 So.3d 145, 152 (holding that notice six weeks prior to the commencement of trial was sufficient). The district attorney disclosed this evidence pursuant to Mr. Farrier’s motion requesting the production of any and all evidence the prosecution intended to introduce under Article 412.2. Mr. Farrier, prior to trial, also filed a motion in limine to have all of the recordings excluded from trial. That motion was denied by the trial judge in September 2012. Furthermore, the transcript from the trial also reveals that defense counsel stated to Lithe trial judge that counsel had knowledge of the contents of all of the tapes and was prepared to make contemporaneous objections as to any of the tapes.
Thus, it is clear that Mr. Farrier received more than sufficient notice under Article 412.2 and was not “ambushed” with this evidence. We find that the trial judge *1247 did not abuse her discretion in overruling Mr. Farrier’s objection.
3
Mr. Farrier’s final objection to the second recorded telephone call asserted that its content was unduly prejudicial in nature under Article 403. The statements on this phone call displayed Mr. Farrier’s lustful disposition towards children under Article 412.2 and included specific comments made by Mr. Farrier about his desire to have sexual relations with young girls. Mr. Farrier at trial does not explain why this particular evidence is more prejudicial than probative. Thus, the trial judge did not abuse her discretion in admitting this recorded conversation.
C
The final telephone conversation admitted into evidence was placed by Mr. Farrier to an unidentified woman on August 11, 2011. This conversation primarily focused on Mr. Farrier’s home computer, which had been seized by the police in their execution of the search warrant. Mr. Farrier implies that he cannot be held responsible for what the police may have found on his computer because the computer was not locked up and nothing on the device was private. The woman, apparently referring to child pornography, tells him that “it’s not nothing you supposed to be having.”
Mr. Farrier states that as far as Admir-abilis is concerned he has “done nothing.” Mr. Farrier inquires whether there is any way to talk “them” out of |aapursuing the charges and is told that Admirabilis “said your name and said you would whoop her ass” if she told anyone what he did.
At trial, Mr. Farrier initially objected to the introduction of this recording based upon the prosecution’s failure to provide the requisite notice under La. C.E. art. 412.2 and relevance. Then, Mr. Farrier retracted that objection and entered a general objection to the recording as irrelevant and more prejudicial than probative. In denying the objection, the trial court determined that references to child pornography on a computer had already been raised through trial testimony. Here, again, the seizure of the computer was relevant to the previous trial testimony that Mr. Farrier made Admirabilis look at inappropriate images on the computer with him. Thus the statements are relevant to this prosecution and indicate a lustful disposition toward children.
Mr. Farrier at trial does not set forth any reasons as to why this evidence is unduly prejudicial. We are not persuaded by the defendant that the trial judge abused her discretion in finding the admission of this evidence would not strip the jury of its capacity to render a proper verdict in this matter.
D
Therefore, nothing in the record shows that the trial judge abused her discretion in admitting the three voice recordings of Mr. Farrier’s calls made during his pretrial detention.
DECREE
We affirm the conviction of Mr. Farrier for sexual battery and his sentence.
AFFIRMED.

. We have assigned pseudonyms to the minor- ' victim and her mother in order to best shield the victim's identity.

. As the duration of this sentence falls within the relevant statutory range, this sentence is legally imposed. See La. R.S. 14:43.1 C(2) ("Whoever commits the crime of sexual battery on a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.”).

. We have, as we always do, conducted an errors patent review and have detected no such error. See La.C.Cr.P. art. 920(2); State v. Gayton, 13-1613, pp. 5-6 (La.App. 4 Cir. 1/28/15), 158 So.3d 955 (elaborating upon the errors patent review conducted by this Court).

. This version of Article 702 was applicable at the time of the trial; later that year Article 702 was amended by Acts 2014, No. 630 § 1.

. A determination regarding the competency of a witness is "within the discretion of the trial court. ... A district court's decision to qualify an expert will not be overturned absent an abuse of discretion.” Cheairs v. State ex rel. Dept. of Transp. & Dev., 03-0680, p. 6 (La.12/3/03), 861 So.2d 536, 541.

. Dr. McAuliff has been extensively educated in the field of psychology, obtaining undergraduate and graduate degrees in that field. Moreover, in addition to his doctorate from Florida International University, he obtained a law degree from the University of Nebraska College of Law. He is a professor at California State University, Northridge (CSUN) and has been teaching at the university level for almost twenty years. His list of publications in refereed journals is impressive, and he has clearly focused his professional research interest at the intersection of legal fact-finders’ decision-making and witness reliability.

.Indeed, it is improper for an expert witness to express an opinion about the credibility of a particular child-witness. See Foret, 628 So.2d at 1130.

. Both of the above cited articles were included in Mr. Farrier’s proffer.

. Research and proffered testimony about eyewitness reliability is often based upon staged- or mock-crime scenarios. See State v. Stucke, 419 So.2d 939, 944 (La.1982); State v. Young 09-1177, p. 9 (La.4/5/10), 35 So.3d 1042, 1047.

. The conversation treated in section A is identified at trial as Call 3. The conversation treated in section B is identified as Call 2. And the one in section C is identified as Call 1.

. "Article 412.2 was enacted to loosen restrictions on 'other crimes’ evidence, and to allow evidence of 'lustful disposition’ in case involving sexual offenses.” Wright, 11-0141, p. 13, 79 So.3d at 317. See also State v. Williams, 02-1030, pp. 4-6 (La.10/15/02), 830 So.2d 984, 98687.

. "The traditional exclusion of hearsay in Anglo-American jury trials is based upon historic considerations of unreliability and of potential unfairness to an accused to permit into evidence damaging out-of-court statements which cannot be tested as to their basis in fact, or by cross-examination of the out-of-court declarant." State v. Ford, 336 So.2d 817, 821 (La.1976).

. "A ‘statement' is: (1) An oral or written assertion; or (2) Nonverbal conduct of a person, if it is intended by him as an assertion.” La. C.E. art. 801 A.